**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES PALMER,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | |
| | : | **No. 25-7043** |
| **FRANK BISIGNANO,** **Commissioner of Social Security,** | : | |
| Defendant. | : | |

**Perez, J.** **July 31, 2026**

## MEMORANDUM

James Palmer suffers from an autoimmune inner ear disease, bilateral hearing loss, tinnitus, and essential tremor. Due to these health issues, Palmer retired at age 58 from his job as a music teacher at Overbrook School for the Blind. Following his early retirement, he applied for Social Security Disability Benefits (SSD). An administrative law judge (ALJ) held a hearing and denied his application. In finding Palmer is not entitled to SSD, the ALJ found Palmer is able to perform medium work[1] with certain limitations and that he can engage in frequent[2] handling, fingering, and feeling[3]. In so deciding, the ALJ did not consider Palmer's journal entries documenting increased tinnitus during "flares" or the medical evidence from two neurologists documenting his difficulties holding and carrying things because of essential tremors. The ALJ did not explain why she disregarded that evidence.

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). If an individual is capable of medium work, they are also capable of light and sedentary work. *Id.*
[2] Frequent means occurring one-third to two-thirds of the workday. SSR 83-10.
[3] These three terms require progressively finer usage of the upper extremities. SSR 85-15. Handling entails seizing, holding, grasping, turning, and otherwise working primarily with the whole hand or hands. *Id.* Fingering involves picking, pinching, or otherwise working primarily with the fingers. *Id.* Feeling merely involves the ability to feel the size, shape, temperature, and texture of an object by the fingertips. *Id.*

Palmer now asks this Court to review the denial of SSD, arguing the ALJ's decision is not supported by substantial evidence. For the reasons discussed below, Plaintiff's request for review is granted.

## I. Background

James Palmer is a college graduate who worked as a music teacher at Overbrook School for the Blind for approximately 37 years. ECF No. 6-6 at 57. When he was 58 years old, he began suffering from severe autoimmune inner ear disease, bilateral sensorineural hearing loss, tinnitus, and essential tremor. ECF No. 6-2 at 21. Palmer first applied for SSD on July 26, 2023, alleging disability since January 31, 2023. *Id.* at 18. His application was first denied on March 29, 2024, and then again upon reconsideration on June 13, 2024. *Id.* On March 5, 2025, a telephone hearing was held with an ALJ. *Id.* On April 24, 2025, the ALJ denied Palmer's application for SSD. *Id.* at 2. Palmer requested that the Appeals Council review his decision on June 18, 2025, but this request was denied on November 17, 2025. *Id.* at 5. The ALJ's denial of Palmer's SSD stands as the Commissioner's final decision. *Id.*

In denying Palmer SSD, the ALJ found he was not "under a disability within the meaning of the Social Security Act." *Id.* at 19. The ALJ found Palmer has not engaged in substantial gainful activity since January 31, 2023, and that he has severe impairments—autoimmune inner ear disease, bilateral sensorineural hearing loss, tinnitus, and essential tremor—which significantly limit his ability to perform basic work activities. *Id.* at 20–22. The ALJ then found that Palmer has the Residual Functional Capacity (RFC) to perform medium work with certain limitations:

> Palmer has the residual functional capacity to perform medium work…except [he] can tolerate exposure to no more than moderate noise. [He] must not be required to communicate by phone. [He] is capable of frequent handling, fingering, and feeling. [He] is capable of performing simple, routine tasks and making simple decisions. [He] is capable of occasional interacting with public, supervisors, and coworkers.

> [He] is capable of performing jobs that are limited to hearing and communicating only simple oral instructions and information.

*Id.* at 23. The ALJ found that while Palmer's impairments could reasonably cause the problems with hearing and understanding that Palmer alleged, his testimony about the intensity, persistence, and limiting effects of these symptoms, such as his inability to make or receive phone calls during flares or his inability to follow oral instructions at times, were not consistent with the medical evidence and other evidence for reasons explained in her decision.[4] *Id.* at 23–24.

Based on her determination of Palmer's RFC, the ALJ found that Palmer is unable to perform his past relevant work (as a music teacher). *Id.* at 27. However, based on the same determination of Palmer's RFC, the ALJ found that Palmer was not entitled to SSD because the vocational expert identified three medium level, unskilled work occupations—laundry worker, vehicle cleaner, and cleaner—that Palmer could perform and that existed in significant numbers in the national economy. *Id.* at 28.

**A. Medical Evidence**

In determining Palmer's RFC, the ALJ considered Palmer's longstanding autoimmune inner ear disease with bilateral sensorineural hearing loss, tinnitus, and left tympanic membrane perforation. ECF No. 6-2 at 23. The ALJ considered the medical evidence in chronological order. The medical evidence from 2023 included two hematology reports that indicated relatively stable condition but worsening hearing, ECF No. 6-8 at 463, and a primary care report that indicated Palmer's right ear was stable but his left ear fluctuates and had worsened over the past year, No. 6-9 at 173-74.

---

[4] Regarding medical evidence, the ALJ noted a 2024 otolaryngology exam that demonstrated improvement in speech thresholds and pure-tone thresholds along with an improvement in tinnitus with compression of the left jugular vein. ECF No. 6-2 at 25. Additionally, the ALJ notes a 2025 otolaryngology exam that showed improvement in hearing and speech reception thresholds. Regarding other evidence, the ALJ mainly drew upon Palmer's daily function report and a 2024 consultive otorhinolaryngological examination. *Id.* at 26.

In the spring of 2024, Palmer was examined by an ear, nose, and throat (ENT) specialist and had an otolaryngology evaluation.[5] ECF No. 6-8 at 256-57; ECF No. 6-9 at 196. The ENT specialist noted bilateral hearing loss for which Palmer used hearing aids, and cerumen impaction and debris in the left ear for which Palmer underwent cerumen debridement. ECF No. 6-8 at 256-57. The otolaryngology evaluation noted great fluctuations in Palmer's hearing and the fact that it had not returned to baseline for eighteen months, a tube in the left ear that caused perforation of the left tympanic membrane, and tinnitus. ECF No. 6-9 at 196. Palmer also provided a primary care report noting an increase in his tinnitus and subsequent decline in hearing in his left ear. ECF No. 6-9 at 174. The primary care provider noted that Palmer had exacerbations of hearing loss two to three times a year that would improve in four to eight weeks. *Id.* In the winter of 2024, Palmer was examined again by an otolaryngologist, who reported an improvement in Palmer's hearing loss and tinnitus. ECF No. 6-9 at 197.

In January 2025, Palmer participated in a clinical trial researching medical approaches to tympanic membrane perforations. ECF No. 6-9 at 209-53. After the trial, an otolaryngology visit demonstrated Palmer's hearing had improved. ECF No. 6-9 at 195.

In March 2024, Palmer attended a consultative otorhinolaryngological examination after being referred by the Bureau of Disability Determination. ECF No. 6-8 at 240-243. The exam indicated Palmer experienced moderate to severe bilateral hearing loss. *Id.* at 243. Although Palmer could hear normal conversation without hearing aids, he could not hear finger rubs or whispers unaided. *Id.* at 242. Further, hearing aids improved his hearing and aided word recognition from 80% to 90% on the right side. *Id.* at 243. Palmer's speech was normal in volume,

[5] An otolaryngology evaluation is a detailed medical checkup of a patient's ears, nose, throat, head, and neck performed by an ENT specialist. *What Is an Otolaryngologist?*, ENT & ALLERGY ASSOCIATES (Jan. 7, 2025), https://www.entandallergy.com/blog/2025/january/what-is-an-otolaryngologist-/.

intelligibility, and sustainment. *Id.* at 242. The examination also noted that Palmer can cook, clean, do laundry, shop, provide childcare, shower, bathe, and dress in addition to watching television, listening to music, reading, going out to museums, taking walks, and socializing with friends. *Id.* at 241.

Palmer also presented primary care progress notes from 2024, which noted that his essential tremor was not severe at the time. ECF No. 6-9 at 172. In addition, neurology progress notes from neurologist Dr. Spindler in 2024 noted that Palmer's autoimmune inner ear syndrome medication worsens the tremor. *Id.* at 158. That medication, propranolol, provided no benefit and was replaced with primidone, which provided only a 20% short-term benefit. *Id.* The same neurologist report noted that "the tremor has progressed over time, and is interfering with holding things, esp[ecially] beverages," a functional limitation the ALJ's decision did not mention. *Id.* Finally, Palmer had a physical exam in 2024 indicating a postural and action tremor that was mild on the right and moderate on the left. *Id.* at 159. At this exam, Dr. Spindler prescribed a re-trial of the propranolol. *Id.* The ALJ did not discuss Palmer's two visits to the neurology department at the Perelman Center for Advanced Medicine in 2023. During these visits, neurologist Dr. Morganroth noted that "[i]t is now harder for [Palmer] to hold things with his hands . . . he needs to plan ahead on how to pick up an object or glass." ECF No. 6-8 at 112. Generally, the ALJ did not discuss Palmer's difficulty holding things in her decision or whether she considered or disregarded those notes.

Palmer submitted opinions from four additional medical sources, which opined that Palmer was unable to work due to his disabilities. ECF No. 6-8 at 2, 10, 11; ECF No. 6-9 at 137. The ALJ did not find those opinions persuasive because she did not provide specific functional limitations or evaluate Palmer's ability to perform other work besides his previous teaching job. ECF No. 6-

2 at 27. The ALJ also disregarded the opinions from two State Agency medical consultants who found Palmer's impairments to be non-severe because additional, later documentation showed otherwise. *Id*

**B. Nonmedical Evidence**

The record also contains nonmedical evidence. Two notable pieces of nonmedical evidence include Palmer's testimony at the March 5, 2025 administrative hearing, ECF No. 6-2 at 36-72, and his function report, a questionnaire created by the Social Security Administration regarding how his impairments affect his daily living, ECF No. 6-6 at 2-9.

Regarding his hearing loss and tinnitus, Palmer testified that he experiences "flares," where his pulsatile tinnitus gets significantly louder and his hearing drops drastically. ECF No. 6-2 at 49. Palmer testified that during his most recent flare (during Super Bowl Sunday), he was unable to speak on the phone and unable to communicate with his partner verbally. *Id.* at 49-50. He also testified that during these flares, he has difficulty understanding people and socially isolates at home. *Id.* at 50, 53. In addition, Palmer provided journal entries recounting these flares, which he called "meltdowns," describing generally at least one "meltdown" per month. ECF No. 6-6 at 137-212; ECF No. 6-7 at 1-52. The ALJ did not mention these journal entries or the increase in tinnitus during his flares in her decision.

Regarding his essential tremors, Palmer testified that the longer he holds an object, the worse his tremor becomes. ECF No. 6-2 at 56. He also testified that he has to plan ahead before picking things up such as beverages. *Id.* Additionally, he testified that he generally needs a break every ten to fifteen minutes when he is actively doing something with his hands. *Id*. at 63.

Palmer's adult function report showed he could generally perform normal everyday tasks independently, including cooking, cleaning, shopping, and socializing. ECF No. 6-6 at 2-9.

## II. Legal Standard

### A. Social Security Act Five-Step Evaluation

The Social Security Administration has established a five-step sequential evaluation process to determine whether an individual is disabled under the Social Security Act. 20 C.F.R. § 404.1520; *Williams v. Sullivan*, 970 F.2d 1178, 1180 (3d Cir. 1992). First, the Commissioner considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). A claimant who is performing substantial gainful activity is not disabled, and the claim must be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)). Second, the Commissioner determines whether the claimant has a severe medically determinable impairment. 20 C.F.R. § 404.1520(c). If the claimant does not establish that his impairments are severe, he is not entitled to disability benefits. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). Third, the Commissioner evaluates whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations that are considered sufficiently severe to prevent any substantial gainful employment. 20 C.F.R. § 404.1520(d). Even if the impairment neither meets nor equals a listed impairment, the evaluation continues to steps four and five so long as the impairment is considered severe. *Plummer*, 186 F.3d at 428.

Before proceeding to the fourth step, the ALJ must assess the claimant's RFC. *Plummer*, 186 F.3d at 428. "'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citing *Hartranft v. Apfel,* 181 F.3d 358, 359 n.1 (3d Cir.1999)). The ALJ must consider all of the claimant's medically determinable impairments, including non-severe impairments. *Jane A. v. Dudek*, No. 24-cv-2612, 2025 WL 919450, at *6

(E.D. Pa. Mar. 26, 2025) (citing 20 C.F.R. § 404.1545(a)(2)). The ALJ must also consider statements about what the claimant can still do based upon medical sources and the claimant's testimony of his limitations. *Id.* (citing 20 C.F.R. § 404.1545(a)(3)).

Then, the ALJ proceeds to step four, where she assesses whether the claimant's RFC permits him to perform his past relevant work. 20 C.F.R. § 404.1520(f). The claimant bears the burden of proving he cannot return to his past relevant employment. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). At the fifth and final step, the burden shifts to the Commissioner to demonstrate the claimant can perform other work that exists in significant numbers in the national economy that is consistent with the claimant's medical impairments, age, education, past work experience, and RFC. *Plummer*, 186 F.3d at 428. The Commissioner will typically seek the advice of a vocational expert at this step. *Id.* (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).

**B. Judicial Review**

The Court reviews the Commissioner's denial of SSD for substantial evidence supporting the decision. *Plummer*, 186 F.3d at 427 (citing *Adorno*, 40 F.3d at 46). "The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." *Id.* at 427 (citing 42 U.S.C. § 405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986)). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Id.* (internal quotations omitted) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)).

The district court may not reweigh the evidence or impose its own factual determinations. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Even if the record could support a contrary conclusion, it cannot

overrule the ALJ's decision so long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The Court's role is not to substitute its judgment for that of the ALJ, who is responsible for weighing the evidence and resolving factual issues. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). However, for the Court to conduct meaningful judicial review, it "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id.*

## III. Discussion

In his request for review, Palmer argues the ALJ erred in two ways when determining his RFC. ECF No. 7 at 3. First, he argues the ALJ misunderstood the nature of his flares because she failed to address the increase in tinnitus during his flares. *Id.* He specifically argues that the ALJ erred in failing to consider his journal entries, which are crucial to comprehending the nature of his flares. *Id.* at 5-7. In effect, Palmer argues the ALJ failed to account for the frequency and effect of his flares on his functional capacity to perform sustained work in the future. *Id.* at 4. Second, Palmer argues the ALJ erred in finding he could perform medium work and engage in frequent handling, fingering and feeling. *Id.* at 8. He argues the ALJ did not adequately account for limitations caused by his tremor because she did not discuss Palmer's testimony or medical records reflecting functional limitations pertaining to his difficulties in handling and carrying objects. *Id.* at 8-11. Overall, he argues the combination of these impairments makes it impossible for him to perform any kind of sustained work. *Id.* at 3.

**A. The ALJ Did Not Consider Palmer's Journal Entries Regarding his Flares**

A discussion of every piece of evidence is not required so long as the ALJ provides some analysis for a particular line of evidence. *DeJesus v. Berryhill*, No. 16-01061, 2017 WL 1847355, at *6 (E.D. Pa. Mar. 21, 2017), *R. & R. approved*, 2017 WL 1843897 (E.D. Pa. May 8, 2017) (finding no error in failing to consider journal entries because they were cumulative of claimant's testimony and adult function report, which ALJ considered). However, the ALJ must ensure the court understands "which evidence the ALJ accepted, which she rejected, and why." *Id.*

Here, the ALJ did not provide analysis along the specific line of evidence surrounding the flares documented in Palmer's journal entries. While the ALJ mentioned Palmer's flares briefly, she only discussed them in the context of an increase in hearing loss. She failed to mention the impact of the main impairment that occurs during the flares—Palmer's increase in tinnitus, a condition the ALJ found severe. ECF No. 6-2 at 23. Notably, the medical evidence the ALJ included demonstrates some improvement in Palmer's hearing but does not demonstrate any improvement in his flares and fluctuating hearing, which are symptoms supported by his primary care provider, ECF No. 6-9 at 173-74 (finding Palmer's hearing in his left ear was fluctuating and had worsened throughout 2023), and his otolaryngologist, ECF No. 6-9 at 196 (noting on April 15, 2024 that Palmer's hearing fluctuates greatly and had not returned to baseline in the past eighteen months). Additionally, Palmer's journal entries provide greater insight into his flares and their frequency than is reflected in the evidence the ALJ considered. *Compare* ECF No. 6-6 at 137-212 (journal entries), *with* ECF No. 6-2 at 49-50 (ALJ's decision).

The ALJ's mischaracterization of Palmer's flares is significant because it prevented any meaningful evaluation of Palmer's testimony that his tinnitus substantially worsens during those episodes. The decision contains no explanation for rejecting the evidence of the tinnitus flares,

leaving the Court unable to conduct meaningful judicial review. This omission is consequential because the frequency and severity of Palmer's flares bear directly on his ability to sustain employment. Palmer testified that during flares he must take multiple breaks throughout the workday. ECF No. 6-2 at 64. His journal entries further indicate that these flares occur approximately once per month and can last up to ten days. ECF No. 6-6 at 138–212. The vocational expert testified that competitive employment would be eliminated if an individual were off task for more than ten percent of the workday or absent more than one day per month, and that an employee who required extended absences early in employment would likely be terminated. ECF No. 6-6 at 67, 69. Palmer also testified that during flares his hearing deteriorates to the point that he cannot communicate with others and instead must communicate with his partner by text message. ECF No. 6-2 at 50. The vocational expert testified that an individual who is unable to communicate with coworkers or supervisors would be unable to perform any work. ECF No. 6-6 at 69-70. The Court cannot determine whether the RFC adequately accounts for the functional limitations Palmer experiences during his flares because the ALJ did not address this evidence or explain why she rejected it.

The ALJ additionally erred in not considering Palmer's flares in her discussion of his daily activities. Where an impairment fluctuates in severity, an ALJ must consider the extent to which a claimant's daily activities are limited during periods of exacerbation rather than relying solely on evidence that the claimant can perform those activities generally. *See Yawitz v. Weinberger*, 498 F.2d 956, 958-60 (8th Cir. 1974). In *Yawitz*, the plaintiff suffered from severe, unpredictable headaches, but the ALJ found him capable of substantial gainful activity based on his daily activities, including driving, home projects, and occasional travel. *Id.* at 958, 960. The Eighth Circuit found the ALJ erred by ignoring evidence that the plaintiff drove only limited distances,

traveled infrequently, and completed projects at a slow pace. *Id.* at 960. Here, Palmer's alleged flares are unpredictable, as supported by both Palmer's testimony as well as by medical records. ECF No. 6-2 at 61; ECF No. 6-2 at 7. Even though Palmer is normally able to spend time with others, video chat, watch TV, listen to music, and go out to museums and concerts, he is not able to do these things during his flares, and he socially isolates instead. *See* ECF No. 6-2 at 14-15. Like in *Yawitz*, the ALJ did not discuss the effect of Palmer's flares on his daily activities. This was error.

### B. The ALJ Did Not Adequately Account for Palmer's Limitations Caused by his Essential Tremor.

When there is conflicting medical evidence, the ALJ can choose which evidence to credit, but she cannot discount evidence "for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (internal quotations omitted) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). Further, the ALJ must consider medical opinions alongside all the relevant evidence and explain the weight given to each piece of evidence. *Chandler*, 667 F.3d at 362. Nevertheless, the ALJ is not required to discuss *every* item of evidence, particularly when certain medical evidence is not especially notable. *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Medical evidence is more notable if the doctor pursues treatment plans. *See id.* (citing *Welch v.* Heckler, 808 F.2d 264, 270 (3d Cir. 1986)) (finding an ALJ need not discuss x-rays showing spinal degeneration if that evidence demonstrates no relationship to the claimant's pain or work-related functional limitations, and no treatment or medication was recommended).

In determining Palmer's RFC, the ALJ only briefly discussed Palmer's tremor—a severe impairment. ECF No. 6-2 at 25, 21. Even though the ALJ is not required to discuss every piece of medical evidence regarding Palmer's tremor, the ALJ is still required to discuss reasons for discounting notable evidence, which she failed to do. *See Hur*, 94 F. App'x at 133. Specifically,

the ALJ failed to discuss the portions of Dr. Morganroth's written report which noted that Palmer had to "plan ahead on how to pick up an object or glass" and Dr. Spindler's report that Palmer's tremor had progressed and was interfering with his ability to hold things like beverages. ECF No. 6-8 at 112; ECF No. 6-9 at 158. Dr. Morganroth and Dr. Spindler's reports are notable because there is a direct relationship between them and Palmer's functional limitations. *Cf. Hur*, 94 F. App'x at 133. There is also ample evidence in this record of different treatment plans and medication for Palmer's tremors. *E.g.*, ECF No. 6-9 at 172-85; *cf. Hur*, 94 F. App'x at 133. Finally, while an ALJ is permitted to credit parts of an opinion without crediting the entire opinion, she must still explain their rationale for doing so. *Byrd v. Comm'r of Soc. Sec.*, No. 23-4957, 2024 WL 4631645, at *9 (E.D. Pa. Oct. 30, 2024). The ALJ did not do so here.

Moreover, the ALJ must build a "logical bridge" between the evidence she considers and the limitations she includes in her RFC determination. *Dudek*, 2025 WL 919450, at *6 (internal quotations omitted) (quoting *Nolasco v. Kijakazi*, No. 21-cv-4119, 2023 WL 2773532, at *12 (E.D. Pa. Apr. 3, 2023)). In *Dudek*, the ALJ concluded the plaintiff's medical condition, gastroparesis, was severe, but failed to include any description of how her gastroparesis limited her functional capacity. *See id.* at *4. The court explained that "[t]hough '[t]he ALJ need only include in the RFC those limitations which he finds to be credible,' . . . the ALJ must explain why he found certain limitations unwarranted, and further 'must build "a logical bridge between the evidence and the result,"' . . . in order to withstand scrutiny." *Id.* at *6 (first quoting *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007); and then quoting *Kijakazi*, 2023 WL 2773532, at *12) (second alteration in original). Specifically, the court found the ALJ failed to account for the claimant's own testimony and two sources of medical evidence which suggested that the gastroparesis may affect her ability to stay on task or meet quotas due to her need for frequent

breaks. *Id.* at *7. *See also Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) ("[S]ocial security regulations permit, and indeed require, an ALJ to offer a narrative discussion describing how the evidence supports each limitation at step four of the disability analysis." (cleaned up)).

Here, the ALJ failed to provide a "logical bridge" or a "narrative discussion" on how the cited primary care and neurology progress notes regarding Palmer's tremor, ECF No. 6-2 at 25, alongside Palmer's own testimony of needing frequent breaks in between actively using his hands to perform a task, ECF No. 6-2 at 63, supported her determination that Palmer could engage in "frequent handling, fingering, and feeling." ECF No. 6-2 at 23. While the ALJ found Palmer's essential tremor severe at step two, she did not explain why she omitted medically supported limitations from Palmer's RFC. ECF No. 6-2 at 25, 23. The ALJ failed to explain why she determined Palmer could engage in "frequent handling, fingering, and feeling" despite Dr. Morganroth's testimony that Palmer had to "plan ahead on how to pick up an object or glass" and Dr. Spindler's testimony that Palmer's tremor had progressed and was interfering with his ability to hold things. Her failure to discuss this evidence and explain its weight in relation to her RFC determination was error. *See Dudek*, 2023 WL 2773532, at *4 (finding ALJ should have explained why medically supported limitations affecting her ability to stay on task and her need for frequent breaks were excluded from the RFC).

## IV. Conclusion

The ALJ's decision is not supported by substantial evidence because she failed to consider Palmer's journal entries documenting his flares and the medical opinions of two neurologists regarding his essential tremor when assessing his residual functional capacity. Accordingly, the plaintiff's request for review is granted.

An appropriate Order follows.